IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

FIRST NATIONAL BANK OF OMAHA,

                                Plaintiff-Appellant,                OPINION AND ORDER

     v.

                                                     11-cv-675-wmc

PHOUTHASONE SYSOUVANH,

                              Defendant-Appellee.

From March through July, 2010, Mrs. Phouthasone Sysouvanh charged approximately $11,000 on a credit card issued to her by the First National Bank of Omaha ("FNBO"). On October 3, 2010, she and her husband filed for Chapter 7 relief in the Bankruptcy Court for the Western District of Wisconsin. FNBO initiated an adversary proceeding to except the credit card debt from discharge pursuant to the anti-fraud provisions of 11 U.S.C. § 523(a)(2). The bankruptcy court not only found the debt dischargeable, it awarded attorneys' fees and costs to Mrs. Sysouvanh on the ground that FNBO's adversary proceeding was not substantially justified.

FNBO appeals both aspects of the bankruptcy court's judgment, as well as the court's exclusion of certain of its exhibits.[1] In addition, defendant Sysouvanh has filed two motions to strike portions of FNBO's briefing. The court will grant the first of plaintiff's motions and deny the second, while upholding the bankruptcy court's exclusion of exhibits never properly proffered at trial. As for the substance of the appeal,

---

[1] This court has jurisdiction under 28 U.S.C. § 158(a) to hear FNBO's appeal, because the final judgment was entered by a bankruptcy judge serving this same judicial district.

the court will affirm, finding none of the bankruptcy court's findings of fact to be clearly erroneous and its application of the law consistent with those findings.

BACKGROUND[2]

**A.  FNBO Line of Credit**

Mr. Doth Sysouvanh and Mrs. Phouthasone Sysouvanh reside in Sun Prairie, Wisconsin, with their three children.  Mr. Sysouvanh has been employed by Kraft Foods as an accountant for the past thirteen years.  Mrs. Sysouvanh is presently a full time homemaker, but has worked in the past to supplement the family's income.  Mr. and Mrs. Sysouvanh regularly sit down together to pay the family's bills and discuss family finances.

On March 28, 2008, FNBO sent Mrs. Sysouvanh a pre-approved offer for a Visa credit card.  Mrs. Sysouvanh filled out the application, stating that she was self-employed and that her "total annual income" was $98,000, which was the amount of her husband's salary.[3]  When FNBO received Mrs. Sysouvanh's completed application, it requested her credit report through the Experian credit rating service.  The credit report stated that Mrs. Sysouvanh was employed, had twenty-five open credit card accounts and carried outstanding debt of $44,534.

After reviewing this information, FNBO approved the application, extending Mrs. Sysouvanh a $15,000 line of credit and sending her a new card, along with FNBO's

---

[2]   The court adopts in substantial part the bankruptcy court's findings of background facts, which the parties do not dispute.

[3]   The application instructed Mrs. Sysouvanh to include "income from any source."

"Cardmember Agreement" by mail.  The Agreement states in pertinent part: "Each time you use your account, you are representing . . . that you intend to repay all amounts due. . . . [Y]ou must pay at least the minimum payment shown on your billing statement." (Bankr. W.D. Wis., Case No. 11-00001, dkt. #19, ex. 24, p. 2.)

From the summer of 2008 until August 2009, Mrs. Sysouvanh incurred charges and made at least the minimum monthly payments required by the Cardmember Agreement.  In August 2009, she and her husband paid off the balance on the card -- approximately $12,190 -- in one lump-sum payment.  Mrs. Sysouvanh then stopped using the card and did not incur any new charges on the account until late March, 2010.

### B. Accumulation of Debt

On March 31, 2010, Mrs. Sysouvanh's credit card account was in good standing. By that time, however, the Sysouvanhs had taken on mortgage loans of $222,000 and $41,000, a car loan of $12,980, a loan against Mr. Sysouvanh's 401k for $33,000, and $96,000 in unsecured debt on ten credit cards.  The record does not show what their income was in March, but at the time of the bankruptcy filing in October, the Sysouvanhs' monthly net take home income was approximately $5,226.[4]  Their average monthly household expenses were approximately $5,134.

---

[4]  This net income is based on gross monthly income of $7,878, minus taxes and other fixed deductions.  For the two years before filing for bankruptcy, the Sysouvanhs did not receive income from any source other than from Mr. Sysouvanh's employment and interest/dividend income.  Aside from slight fluctuations in Mr. Sysouvanh's annual bonus, they did not anticipate any increases or decreases in income within the year following the bankruptcy filing.  For the six years before their bankruptcy filing, neither of the Sysouvanhs was self employed or had a self-owned business.

Despite, or perhaps because of, the family's precarious debt load, Mrs. Sysouvanh also began to put more charges on her credit cards, including, from late March to July 15, just over $11,063.39 in charges on the FNBO credit card account. Some of the charges made during this period were for necessities like food and gas, while others were for non-essential items, including charges at Cherokee Country Club totaling $3,181.77; charges at Dick's Sporting Goods, Sports Authority, Boston Store, Justice, Macy's, Victoria's Secret, Limited Stores, Charlotte Russe, Prairie Athletic Club, Coach, The Picture People, and Tennis Warehouse totaling $2,093.72; charges at Babies-R-Us totaling $730.75; and charges at Delta Air totaling $624.60.

FNBO has a policy of reviewing monthly credit scores and behavior scores for its account holders. Mrs. Sysouvanh made the required minimum payment on her account for the billing cycles ending in April and May, 2010, and retained an FNBO internal credit rating of "acceptable to good." On July 16, 2010, she stopped using the card. She also failed to make the minimum $210 monthly payment for the billing cycle ending in June, which was due to be paid that day. Shortly thereafter, Mrs. Sysouvanh called to inform FNBO that she would not be able to afford the minimum monthly payment on the card.

FNBO immediately suspended her charging privileges, and reduced her credit limit from $15,000 to $11,400, and then $11,300. A representative for FNBO offered Mrs. Sysouvanh two separate payment plan options that would have reduced her minimum monthly payments and interest rate. Mrs. Sysouvanh rejected both options, On July 27, 2010, she did, however, make an online payment of $100 toward her balance. FNBO

4

closed Mrs. Sysouvanh's line of credit on August 20, 2010.  At that time, her balance was approximately $10,900.

### C. Bankruptcy Proceedings

In mid-August of 2010, Mr. and Mrs. Sysouvanh contacted a bankruptcy attorney; on August 27, 2010, the Sysouvanhs obtained pre-bankruptcy counseling certificates; and on October 3, 2010, the Sysouvanhs filed a petition for Chapter 7 bankruptcy relief in the Federal Bankruptcy Court for the Western District of Wisconsin. (Bankr. W.D. Wis., No. 10-bk-17353-rdm, dkt. #1.)  The bankruptcy court discharged their debts on January 5, 2011.

Pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(2)(B), FNBO filed an adversary complaint on January 1, 2011, seeking an exception to discharge for the amount of $11,117.46, plus interest and costs.  (Bankr. W.D. Wis., No. 11-ap-00001, dkt. #1.)  The bankruptcy court held a one-and-a-half hour bench trial on July 8, 2011, at the end of which the court ruled in favor of the Sysouvanhs, permitting the credit card debt to be discharged.  (Bankr. W.D. Wis., No. 11-ap-00001, dkt. #75, p.131-32.) Initially reserving on the question of whether FNBO was substantially justified in bringing the adversary proceeding, the bankruptcy court entered a decision on July 22, 2011, which (1) confirmed its order that the $11,000 debt to FNBO be discharged, (2) found that FNBO's case was not substantially justified and (3) awarded attorneys' fees

and costs to the Sysouvanhs pursuant to 11 U.S.C. § 523(d).[5]  (Bankr. W.D. Wis., No. 11-ap-00001, dkt. #34.)


PRELIMINARY ISSUES

There are three preliminary matters that need to be addressed before the court deals with the substance of the appeal:  (a) Mrs. Sysouvanh's motion to strike portions of FNBO's appellate brief and appendix (dkt. #6); (b) her motion to strike all but the first two pages of FNBO's brief in opposition to a letter she submitted attaching additional legal authority (dkt. #20); and (c) FNBO's challenge to the bankruptcy court's exclusion of certain exhibits during the bench trial.


**A.  First Motion to Strike**

In her first motion to strike, Mrs. Sysouvanh seeks to exclude certain documentary exhibits on grounds that they were not considered as evidence at trial.  This motion will be granted to the extent it seeks to preclude consideration by this court on appeal the following materials that fall outside of the bankruptcy trial record:  FNBO's proposed trial exhibits 5, 11, 13 and 14 (Bankr. W.D. Wis., No. 11-ap-00001, dkt. #19) and its "Total Debt and Minimum Payments Spreadsheet" (Bankr. W.D. Wis., No. 11-ap-00001, dkt. #25, ex. C), as well as reference to these exhibits in its appellate brief (W.D. Wis., No. 10-675, dkt. #3, pp. 9, 22-24, 40).

---

[5]  The bankruptcy court has suspended its final decision on the fee award amount pending resolution of this appeal.

Federal Rule of Bankruptcy Procedure 8006 -- which discusses the procedure for compiling a record for appeal -- suggests, without expressly stating, that matters outside the record cannot be considered.   Furthermore, Rule 8013 dictates that on appeal "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous."  This court could hardly show this level of due deference to the bankruptcy judge's factual findings if it considers additional evidence never presented, admitted or considered by that judge.  While neither side cites a case directly addressing the question, the court is satisfied that the above-cited federal rules of bankruptcy generally preclude this court's consideration on appeal any matter not part of the trial record.

The bankruptcy court's March 16, 2011, pretrial order in advance of the adversary hearing provided for pre-trial submission of proposed exhibits and stated that "[i]f no written objection is made to the court and delivered to the proponent within 7 days of the receipt of [a] proposed exhibit, [the] exhibit[] will be received in evidence without any further authentication."  (Bankr. W.D. Wis., No. 11-ap-00001, dkt. #11.)  Pursuant to this order, on June 25, 2011, FNBO filed a list of proposed exhibits.  On July 1, Sysouvanh filed objections, asserting that exhibits 5, 11, 13 and 14, among others, should be excluded.  On July 6, FNBO responded with reasons why the exhibits should be admitted over objections, attaching in support a "Total Debt and Minimum Payments Spreadsheet."

At the outset of trial on July 8, 2011, the bankruptcy court considered these disputed proposed exhibits.  (Bankr. W.D. Wis., No. 11-ap-00001, dkt. #75, ex.1, p.7.)

7

The court received into evidence approximately half of FNBO's proposed exhibits, but delayed ruling on the remaining exhibits (including the now-contested exhibits), stating that they would "be considered if they're presented as part of the plaintiff's case and offered individually." (*Id.*)  FNBO neither objected to this procedure at the time, nor offered the now-contested exhibits into evidence during trial.

FNBO now argues that the reason these documents were not offered at trial is that the bankruptcy court erroneously excluded them.  But this is simply not true.  As just described, the bankruptcy court simply reserved on the admissibility of those documents.

While the judge rejected FNBO's initial attempts to offer the exhibits into evidence as a pre-trial submission (dkt. #19), the bankruptcy court acted within its discretion in delaying a decision until FNBO introduced the exhibits at trial.  If FNBO had taken the bankruptcy court's invitation to offer the exhibits into evidence during trial, it would have obtained a definitive ruling on their admissibility.  In failing to move their admission, FNBO essentially waived any right to object to the exhibits exclusion.

### B.  Second Motion to Strike

On the other hand, the court will deny Mrs. Sysouvanh's second motion to strike, which seeks to exclude portions of FNBO's brief in opposition (dkt. #19) to Mrs. Sysouvanh's letter of supplemental legal authority.  Specifically, Mrs. Sysouvanh points to Magistrate Judge Crocker's order limiting FNBO's response to no more than two pages in length.  FNBO's four-page brief and 29 pages of exhibits would seem to violate this order.  However, Judge Crocker's order did not say whether the two-page limit applied to

FNBO's brief or to its entire submission (brief plus attached exhibits). Because Mrs. Sysouvanh's initial submission to the court consisted of a one-page letter and *nine* pages of exhibits, the court finds that the two-page limit is most fairly read to apply only to FNBO's brief.

While the brief itself is four pages long -- still two pages over the limit -- the first and fourth pages contain no legal argument, comprising merely a caption and a signature line. FNBO's submission, therefore, substantially complied with Judge Crocker's order.

### C. Evidentiary Rulings

FNBO also argues that the bankruptcy court improperly excluded certain of its trial exhibits. The court finds that there was no mistake of law or abuse of discretion here, for exactly the same reason articulated in granting Mrs. Sysouvanh's first motion to strike. In its pretrial order, the bankruptcy court established a procedure for submitting exhibits into evidence before trial: exhibits timely objected to would be reserved for a ruling at trial, while exhibits not objected to would be automatically admitted. FNBO filed thirty exhibits; Mrs. Sysouvanh timely objected to approximately half of them.

Consistent with its pretrial order, the bankruptcy court addressed the parties' evidentiary objections to the contested exhibits at the beginning of trial. At that time, Mrs. Sysouvanh reiterated her earlier objection, and raised new objections on relevancy grounds. To better assess the relevancy objections, the bankruptcy court instructed the parties that it would rule on each piece of evidence as it was introduced at trial. Although trial exhibits ##4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 26, 27, and 30 were

marked for trial, FNBO made no attempt to actually introduce them.  Thus, like Mrs. Sysouvanh, FNBO waived the right to challenge the relevance of its trial exhibits on appeal.

OPINION

FNBO appeals from the bankruptcy court's judgment that: (1) defendant's discharge was not subject to exception pursuant to 11 U.S.C. §§ 523(a)(2)(A) or (B); and (2) FNBO's challenge to the discharge was not "substantially justified," resulting in an award of attorneys' fees and costs to Mrs. Sysouvanh pursuant to § 523(d).  While the court reviews the bankruptcy court's legal conclusions de novo, findings of fact are reviewed deferentially for clear error.  *See In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007) (citing Fed. R. Bankr. P. 8013 and *In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998)).  A court may find clear error only when it is "left with the definite and firm conviction that a mistake has been committed."  *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).

**I.  § 523(a)(2)(A) - False Pretenses, False Representation, or Actual Fraud**

Section 523(a)(2)(A) of the Bankruptcy Code provides:

> (a) A discharge under section 727 . . . of this title does not
>     discharge an individual debtor from any debt–
>
> . . .
>
> (2) for money, property, services, or an extension, renewal,
>     or refinancing of credit, to the extent obtained by–

10

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

A creditor seeking to have a debt excepted from discharge under § 523(a)(2)(A) bears the burden of proving by a preponderance of the evidence that the debt meets this statutory exception. *Matter of Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). To show false pretenses or false representation, the creditor must prove: (a) the debtor engaged in a knowing or willful falsehood -- obtaining the money through representations or implied representations which she either knew to be false or made with such reckless disregard for the truth as to constitute a willful falsehood; (b) an intent to deceive the creditor; and (c) the creditor "justifiably relied" to its detriment on the false representation/pretense as a material basis for extending money, credit, etc. *Mayer v. Spanel Intern. Ltd.*, 51 F.3d 670, 674-76 (7th Cir. 1995), *abrogated in part by Field v. Mans*, 516 U.S. 59, 72-75 (1995) (replacing *Mayer*'s original "actual reliance" standard with the current "justifiable reliance" standard).[6]  The court considers each of these prongs in order.

---

[6] To show actual fraud, the creditor must demonstrate that: (1) there was a deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another; (2) that the debtor possessed the requisite scienter -- she intended to deceive or trick the creditor; and (3) that the fraud created the debt. *McClellan v. Cantrell*, 217 F.3d 890, 893-94 (7th Cir. 2000). The bankruptcy court did not conduct a separate fraud analysis, either orally at the conclusion of trial or its written decision. This was understandable since the analysis for fraud and for false representation are virtually *identical* with respect to the state of mind required, which is the only genuinely disputed issue in this case. This court similarly will not engage in a separate fraud analysis since analyzing the elements of a false representation will suffice.

### A. First prong: knowing or willful falsehood

When Mrs. Sysouvanh swiped her credit card, FNBO argues that she essentially made two closely-related representations:  (i) she would repay the money; and (ii) she would do so according to the terms of her Cardmember Agreement.

#### i.    generalized intent to pay back the debt at some point

The charging of a purchase to a credit card can constitute false representation when the user has no intention of repaying the debt.  *In re Briese,* 196 B.R. 440, 446-48 (Bankr. W.D. Wis. 1996).   Although no explicit representation to the credit card company is made at that time, a majority of courts accept that for purposes of § 523(a)(2)(A), a credit card swipe is an "implied representation" to the creditor that the debtor intends to repay the charged purchase.[7]  *Id.* at 446.  If the user has no such intention, her purchase amounts to a "knowing and willful falsehood."

Determining the card user's intent is a subjective inquiry.  The difficulty of assessing state of mind has spurred courts to develop a list of objective factors that serve as presumptive signals, including:

> 1. The length of time between charges made and bankruptcy filing;
>
> 2. Whether an attorney was consulted regarding bankruptcy before the charges were made;

---

[7] A few courts have rejected the idea that a credit card purchase is an "implied representation."  *See, e.g., In re Alvi*, 191 B.R. 724, 732 (Bankr. N.D. Ill. 1996).  This court adopts the majority view.  Even if the court were to follow the minority, however, thus holding that Mrs. Sysouvanh never made a representation, her actions might still qualify as fraud (a broader category of deception) and thus still fall under the coverage of §523(a)(2)(A).   *See McClellan*, 217 F.3d at 893 (holding that § 523(a)(2)(A) defines fraud as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another").

3. The number of charges made;

4. The amount of the charges;

5. The debtor's financial condition when the charges were made;

6. Whether the charges exceeded the credit limit of the card;

7. Whether multiple charges were made on the same day;

8. Whether the debtor was employed;

9. The debtor's prospects for employment;

10. The debtor's financial sophistication;

11. Sudden changes in the debtor's buying habits; and

12. Whether the purchases were for luxuries or necessities.

*In re Bungert,* 315 B.R. 735, 739-40 (Bankr. E.D. Wis. 2004).

The bankruptcy court addressed these factors and found that Mrs. Sysouvanh intended to pay off the debts at the time she incurred them.[8] The court emphasized that: (1) Mrs. Sysouvanh testified credibly at trial that she intended to pay off the card's balance; (2) she stopped using the card on July 16, 2010, when she stopped making the minimum payments; (3) she continued to make below-minimum payments even after July 16; (4) she tried to arrange for an alternative payment plan; (5) she returned a pair of sunglasses she had purchased before she stopped using the card; and (6) her spending pattern was not different than ordinary, suggesting no pre-bankruptcy spending "spree."[9]

---

[8] The bankruptcy court found Mrs. Sysouvanh had the intent to repay, but it did not address whether Mrs. Sysouvanh knew she had the *ability* to repay the debt. Contrary to FNBO's suggestion, this was not error. By its express terms, § 523(a)(2)(A) does not apply to "statement[s] respecting the debtor's financial condition."

[9] The court also noted that the family had taken a loan on Mr. Sysouvanh's 401k to pay

On appeal, FNBO argues that several of the twelve "objective" factors cut in its favor, including (1) the short length of time between the charges and the bankruptcy filing, (2) the Sysouvanhs' poor financial condition at the time the changes were made, (3) the Sysouvanhs' high level of financial sophistication, and (4) the fact that a large portion of the expenditures were for luxuries, rather than necessities.

Certainly, the family's finances were in very poor shape at the time Mrs. Sysouvanh made the disputed credit card charges. "If a debtor's financial condition, viewed in its entirety at the time of a credit card charge, presents a hopeless inability to pay, of which the debtor was aware, this is evidence of fraudulent intent." *In re Choi*, 203 B.R. 397, 400 (Bankr. E.D. Va. 1996). While Mr. Sysouvanh brought home a high monthly salary at the time of the bankruptcy filing, a huge portion of that salary went to servicing the family's over $300,000 of secured debt *and* $100,000 of existing unsecured, high-interest credit card debt.

This imbalance between debt and income was also not the result of a sudden calamity, such as unexpected medical bills or loss of a job, that typically would be held to neutralize suspicions of an intent not to pay. Rather, the imbalance was the inevitable result of several years of overspending.[10]  Despite knowing their financial situation was worsening, the Sysouvanhs also continued to pile on debt with high-spending habits. Indeed, Mrs. Sysouvanh must have known that their spending habits were unsustainable, as she and her professional accountant husband regularly sat down together to pay

off a large balance on the card in the past.  Even so, Mrs. Sysouvanh admitted at trial that she had no hope of making a similar payoff at the time she accrued the later charges.
[10] Mrs. Sysouvanh emphasizes the arrival of a baby son as an unprecedented event, but this occurred over a year earlier.

14

household bills and discuss family finances.  Someone in her position should have seen that the family's debt-to-income-ratio had reached a tipping point, and realized that they could not keep up this rate of spending if they truly intended to pay back all of their debts.  Her case is, therefore, reminiscent of classic "hopeless inability to pay" situations.

Mrs. Sysouvanh attempts to distinguish those cases based on her husband's income, noting that in the typical "hopeless inability to pay" case the debtors have such meager incomes and so few financial resources that any hope of maneuvering out of debt is no longer realistic.[11]  In contrast, the Sysouvanh family had a high income and access to some existing wealth.

Moreover, there is evidence that Mrs. Sysouvanh never intended to repay the entire debt.  For example, she mentioned bankruptcy in her discussion with FNBO representatives within days of her last charge on the credit card.  Plus, Mrs. Sysouvanh and her husband spoke with a bankruptcy attorney and began pre-bankruptcy counseling only a month after the final charges were made on the account.

Finally, the nature of many of Mrs. Sysouvanh's purchases cannot pass without remark, as it goes both to the heart of FNBO's argument and the bankruptcy system's ongoing struggle to delineate a meaningful line between genuinely fraudulent conduct and the actions of those who are simply unable to reign in (or even confront) their

---

[11]  For example, the court in *In re Wong*, 207 B.R. 822 (Bankr. E.D. Pa 1997), found not dischargeable the $13,234.49 credit card debt of a debtor earning $800 monthly in total income, having only $35 in disposable monthly income, and carrying unsecured non-priority debt of $145,294.  Similarly, *In re Mercer*, 246 F.3d 391 (5th Cir. 2001); and *In re Choi*, 203 B.R. 397 (Banrk. E.D. Va. 1996), found non-dischargeable large credit card charges incurred at a time when the debtors had already accrued unsecured debt in excess of their small yearly incomes.

15

spendthrift ways or, more commonly still, the millions of Americans in tough financial circumstances who use credit cards as a tool to solve temporary cash flow problems with no clear plan for how they will repay their loans.  Presumably, Congress intended that courts neither find fraud in the latter case, nor reward those who continued to engage in frivolous spending on luxuries despite the looming specter of bankruptcy.[12]  By spending thousands of dollars on country club tennis lessons, plane flights, and expensive clothing purchases in the face of a serious family budget crisis, and only a month or two before hiring a bankruptcy attorney, Mrs. Sysouvanh veered dangerously close to fraud territory.

Still, this court cannot second-guess the credibility determinations the bankruptcy court made at trial, including that Mrs. Sysouvanh made most of these luxury purchases in a good faith (if unwise) effort to support her daughters' budding tennis games. Moreover, as the bankruptcy court found, the Sysouvanhs *might* have turned their financial ship around with a bit more time:  Mrs. Sysouvanh could have gone back to work after their young son got a bit older; she could have taken a second job; and apparently Mr. Sysouvanh had reasonable prospects of a four-figure bonus from Kraft at the end of the year.  Given Mr. and Mrs. Sysouvanh's high earning capacity, the family might have consolidated their debts, adjusted the repayment schedule, boosted income and managed to make it work.  Indeed, the Sysouvanhs had done exactly that with a five-figure, accumulated debt on FNBO's credit card in the past (albeit by using funds from a

---

[12]  This is why § 523(c)(i)(I) establishes a presumption of non-dischargeability to "consumer debts owed to a single creditor and aggregating more than $600 for luxury goods or services incurred by an individual debtor on or within 90 days before the order for relief."  While the instant case falls outside the 90-day term of that provision, the underlying concern remains with respect to the several thousand dollars of luxury purchases incurred by Mrs. Sysouvanh in the months leading up to her bankruptcy.

401K savings plan no longer available for that purpose), no doubt one of the reasons FNBO continued to view them as a "fair to good" credit risk up to the point Mrs. Sysouvanh advised that she would be unable to meet the requirements of a revised monthly payment plan.

Accordingly, there is insufficient evidence on appeal to find that the bankruptcy court clearly erred in crediting Mrs. Sysouvanh's testimony that she *intended* to repay the debt, however unrealistic her intent may have been.  *See In re Morris*, 223 F.3d 548, 554 (7th Cir. 2000) ("Where there are two permissible views of the evidence, the [bankruptcy court's] choice between them cannot be clearly erroneous").

### ii.    promise to repay according to the Cardmember Agreement

FNBO also argues that even if Mrs. Sysouvanh genuinely intended to pay the credit card debt eventually, she could not possibly have intended to comply with the Cardmember Agreement, because she must have known that the family simply had no room in their weekly budget for another minimum monthly credit card payment of approximately $210.   Accordingly, FNBO argues, Mrs. Sysouvanh *must* have made a willfully false representation each time she made an additional purchase on its credit card.

The bankruptcy court dismissed this argument out of hand:

> As to the use of the card and whether that was a false representation, despite the contractual language, there was no representation that was -- first of all, there's no erroneous representation.   The representation was that there was the intention to pay the card. . . . [The] contractual obligation or the failure to fulfill that might be circumstantial evidence with regard to whether there was an intention to repay, but it does not [] standing by itself create an independent ground

for the representation that would have to be made for false
pretenses or misrepresentation.

(Bankr. W.D. Wis. 11-ar-00001, dkt. #75, pp. 132.)

This court is inclined to do the same, except perhaps as to the last charge --
coming as it did just one day before Mrs. Sysouvanh acknowledged her inability to make
even the minimum payment due under her contract.  Even as to this charge, this court
did not have the benefit of hearing from Mrs. Sysouvanh in person and judging her
credibility.  She would be neither the first debtor, nor the last, to be wholly in denial
about her circumstances until forced to confront them.  Moreover, Mrs. Sysouvanh did
not just run up further charges after failing to make her monthly payment.  She stopped
all use of the card and began to discuss the possibility of an alternate payment plan with
FNBO.  Even after these discussions failed, she still made what the bankruptcy court
found was a good faith $100 payment toward the amount owed.  Under all of the
circumstances, the bankruptcy court's finding that Mrs. Sysouvanh still believed she
could make a $210 minimum monthly payment on her FNBO credit card was not
"clearly erroneous."

**B. Second prong: intent to deceive**

There is little to distinguish the first prong of this test -- a knowing and willful
falsehood -- from the second prong -- a specific intent to deceive.  *Mayer*, 51 F.3d at 674-
76; *Matter of Sheridan*, 57 F.3d 627, 635 (7th Cir. 1995).[13]  Since the first prong is met,

_____

[13] While both prongs are about state of mind, the first prong requires an affirmative
statement, while the second does not.

18

the second is as well, there being virtually no difference between (1) borrowing while knowing that one does not intend to repay and (2) having the specific intent to deceive a creditor about one's intent to repay. *See In re Hostetter*, 320 B.R. 674, 683 (Bankr. N.D. Ind. 2005) ("[K]nowledge of falsity/reckless disregard of truth, and intent to deceive, are usually hand-in-glove . . . ."). Because the second prong rises and falls with the first, the court proceeds directly to the third prong.

### C. **Third prong: justifiable reliance**

The bankruptcy court chose not to discuss this prong explicitly, but there can be little doubt that FNBO justifiably relied upon Mrs. Sysouvanh's representations about her intent to pay.[14] "Justifiable reliance" actually entails a two-part test: the creditor must show that it actually relied on the representation (a subjective test), and that such reliance was justifiable under the circumstances (an objective test). *Field v. Mans*, 516 U.S. 59, 74-76 (1995). As for "actual reliance," a creditor must have extended credit on the basis of fraudulent or false information conveyed by the debtor and must show that it would not have entered into the transaction with the debtor had it known the truth. *Id.* at 70. Mrs. Sysouvanh's promise to repay each time she used her card is implicit, but is also appropriately imputed from the fact that FNBO continued to extend her new credit.

---

[14]   The bankruptcy court purported to address reliance in the context of its § 523(a)(2)(A) analysis in its decision (dkt. #34, p.3), but it is clear from context that it was actually considering the representations Mrs. Sysouvanh made on her credit card application, which both parties agree is properly analyzed under § 523(a)(2)(B) (discussed in the next section of this opinion).

As for "justifiable reliance" under the circumstances, the creditor need only show that it would not have been apparent to a person of his or her knowledge and intelligence that the debtor was conveying false information or otherwise conducting fraud. *Field*, 516 U.S. at 70-72. Certainly the number of open credit card accounts and substantial debt (relative to income) should have been red flags, but up until the time Mrs. Sysouvanh confessed her inability to make the minimum payments, she had an extensive history of incurring and then paying off substantial credit card debts. She also maintained an "acceptable to good" credit rating. Thus, unless the court were to indict the credit card industry and consumers for lending and borrowing practices as a whole, FNBO had no objective notice that it should no longer rely upon her implied representations to repay, much less cut off or lower her credit limit.

## II. § 523(a)(2)(B) - Obtaining Money by Use of a False Written Financial Statement

FNBO's other ground for opposing discharge of the debt is its argument that Mrs. Sysouvanh lied on her credit card application, in violation of 11 U.S.C. § 523(a)(2)(B).[15] This section requires the creditor to show, by a preponderance of the evidence, that a

---

[15] Section 523(a)(2)(B) provides in pertinent part that "discharge under section 727 . . . of this title does not discharge an individual debtor from any debt … for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by … use of a statement in writing"

    (i) that is materially false;
    (ii) respecting the debtor's or an insider's financial condition;
    (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
    (iv) that the debtor caused to be made or published with intent to deceive; . . .
11 U.S.C. § 523(a)(2)(B).

debtor made (1) a materially false written statement regarding his financial condition, (2) with an intent to deceive, (3) that the creditor reasonably relied on to its detriment. *Matter of Sheridan,* 57 F.3d 627, 633 (7th Cir. 1995).

### A.  Materially False Written Statement Regarding Financial Condition

A materially false statement is "an important or substantial untruth."  *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985).  The test of whether a falsity is "material" is whether the lender would have made the loan had he known the debtor's true financial condition.  *Id*.  The bankruptcy court did not reach the question of whether the answers were material because it found that they were not even false:  Mrs. Sysouvanh's credit application accurately stated that (1) she was "self-employed," and (2) her husband's income was a source of her income.  In light of the broad questions asked in the very basic loan application form that FNBO chose to provide to Mrs. Sysouvanh, this court agrees with the bankruptcy court's assessment.

Specifically, the bankruptcy court found that a full-time homemaker making a reasonably full disclosure could properly write "self-employed" in response to FNBO's prompt to list one's "present employer."  To the extent that answer had some potential to mislead, it was certainly not false.  The bankruptcy court also found that Mrs. Sysouvanh properly provided her husband's income in response to a prompt to list "all sources of income."  Again, in the context of the bare-bones loan application, this, too, was true enough -- her husband's income was hers to the extent that she was not restricted from using it to help pay for any debts incurred.  To the extent plaintiff or

21

other financial institutions want additional, more nuanced information, the fault is as much or more with the form, as with Mrs. Sysouvanh's responses.

### B. Intent to Deceive

The bankruptcy court also found that Mrs. Sysouvanh had no intent to deceive FNBO with her representations.   Plaintiff has provided no grounds to overturn this finding either:  there is no direct evidence of her intent to deceive, and her answers were reasonable enough that an inference of such an intent cannot be drawn from the circumstances.[16]

## III. § 523(d) -- Substantial Justification for the Adversary Proceeding

Finally, the court turns to the bankruptcy court's award of attorneys' fees and costs to Mrs. Sysouvanh under 11 U.S.C. § 523(d).  Section 523(d) is designed to deter creditors from initiating frivolous adversary proceedings based on allegations of fraud.  It provides:

> [i]f a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) . . . and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d).

---

[16] With no materially false statement and no intent to deceive, the court need not reach the issue of reasonable reliance.

If a creditor's challenge to the dischargeability of a consumer debt is rejected, the creditor also bears the burden of showing that its actions were substantially justified.[17]  *In re Pusateri*, 432 B.R. 191 (Bankr. W.D.N.C. 2010).  The creditor may do this by showing: (1) a reasonable legal theory; (2) a reasonable basis for the truth of the facts alleged; and (3) a reasonable connection between the law and facts alleged.  *In re Pappan*, 334 B.R. 678 (B.A.P. 10th Cir. 2005).  "To be substantially justified," however, means "more than just non-frivolous."  *In re Sasse*, 438 B.R. 631, 651 (Bankr. W.D. Wis. 2010) (citing *Pierce v. Underwood,* 487 U.S. 552, 566 (1988))).

This court agrees with the bankruptcy court that FNBO's § 523(a)(1)(B) argument was not substantially justified.  While FNBO has a plausible argument that Mrs. Sysouvanh's credit application responses were false, the record contains neither direct nor circumstantial evidence of fraudulent intent.  To the contrary, even a cursory review of the bare-bones credit application reveals ambiguous questions and no instructions.  This alone is enough to suggest how a reasonable person *might* have reasonably given the answers as Mrs. Sysouvanh did.  As a result, FNBO lacked any real basis to challenge discharge in the bankruptcy court *or* before this court under § 523(a)(1)(B).

The court finds the question a closer one with respect to the bankruptcy court's determination that FNBO's § 523(a)(2)(A) argument lacked substantial justification, as did the bankruptcy court.  Ultimately, that court found that FNBO (1) "offered only

---

[17]  A consumer debt is defined as debt "incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8).  Mrs. Sysouvanh's debt falls in this category.

23

circumstantial evidence to prove [Sysouvanh's] intention" and (2) had not adduced enough evidence to make a reasonable showing of fraud.  (Bankr. W.D. Wis. 11-ap-0001, dkt. #34, p.5.)  The bankruptcy court's first point is the weaker of the two since it is the rare fraud claim that relies on anything *other* than circumstantial evidence.  *See United States v. Roberts*, 534 F.3d 560, 571 (7th Cir. 2008) (explaining that even in a criminal setting, proof of "[d]irect evidence of an intent to defraud is rare," allowing "specific intent to defraud through circumstantial evidence and inferences" alone (internal quotation marks and citation omitted)).  Not surprisingly, many bankruptcy cases rely on circumstantial evidence alone.  *See, e.g.*, *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th Cir. 2002) (noting that in the bankruptcy context, actual intent as part of a fraud claim though "difficult to prove, [] may be shown through circumstantial evidence"); *In re Ray*, No. 07-Bk–40282, 2008 WL 268991 (Banrk. W.D. Mo. 2008) (same); *In re Wong*, 207 B.R. 822 (Bankr. E.D. Pa. 1997) (same).  Indeed, the 12-part "objective factor test" used by both this court and the bankruptcy court is essentially a list of *circumstantial* factors.

As for the second point, this court finds FNBO's circumstantial evidence more substantial, though not enough to justify an adversary proceeding on its own.  The reasons for this are set forth in the full analysis of the strengths and weaknesses of FNBO's case above.  Among those worth brief reiteration are the Sysouvanhs' level of sophistication, pre-bankruptcy planning and luxury purchases.  Also, a significant portion of the disputed debt incurred *late* in the card's life (several thousand dollars) falls in the "luxury goods" category and the bankruptcy code presumes such debt to be non-

24

dischargeable if purchased within 90 days of an order of bankruptcy relief.[18] 11 U.S.C. § 523(a)(2)(C)(i)(I).

While the luxury goods and services in this case were all purchased more than 90 days before the order of bankruptcy relief, many of them were purchased within 90 days of the date the Sysouvanhs retained a bankruptcy attorney and obtained pre-bankruptcy counseling. Indeed, but for the delay of their own counsel and the court system, many of the disputed purchases would have been subject to this statutory presumption of nondischargeability. Admittedly, plaintiff avoided this presumption here, if barely, which ultimately made defendant's burden of proof insurmountable. Certainly, as the bankruptcy court found, the nature and timing of these purchases substantially justified FNBO pressing for more details as to all the circumstances here.

In considering whether an adversary proceeding was substantially justified, courts often look to whether the creditor at least conducted a preliminary examination of the debtor's condition. *In re Landry*, No. 08-C-947, 2009 WL 959421, *2 (E.D. Wis. Apr. 7, 2009). Here, the record does not indicate that FNBO attended the § 341 creditors meeting or availed itself of the opportunity under Federal Rule of Bankruptcy Procedure 2004(b) to examine Mrs. Sysouvanh under oath and compel her to produce documents prior to the adversary hearing. It shows only that approximately a month before filing the adversary action, FNBO's counsel wrote to the Sysouvanhs' counsel inquiring about their reasons for filing bankruptcy and specifically asking for possible explanations.

---

[18] Luxury goods are defined as "goods or services [not] reasonably necessary for the support or maintenance of the debtor or a dependent of the debtor." 11 U.S.C. § 523(a)(2)(C)(ii)(II).

(Bankr. W.D. Wis. No. 11-ap-0001, dkt. #28, ex. B.)  The Sysouvanhs' counsel replied that in order to provide a proper response, FNBO would have to articulate its exact claim and state its supporting facts.  (*Id.* ex. C.)  No further correspondence was exchanged.

The failure of FNBO's counsel to follow up further before filing an adversary proceeding did not help FNBO's case before the bankruptcy court, nor does it before this court.  Ultimately, Judge Martin's review of the evidence led him "to conclude that while FNBO may have had reason to undertake further review, it was not *substantially* justified in bringing this adversary proceeding."  While a close question, this court finds no fault in that conclusion.

### ORDER

IT IS ORDERED that:

(1) appellee Phouthasone Sysouvanh's motion (dkt. #6) to strike portions of appellant's brief and appendix is **GRANTED** to the extent that the court will not consider on appeal FNBO's proposed trial exhibits 5, 11, 13 and 14 (Bankr. W.D. Wis., No. 11-ap-00001, dkt. #19) and its "Total Debt and Minimum Payments Spreadsheet" (Bankr. W.D. Wis., No. 11-ap-00001, dkt. #25, ex. C), as well as references to these exhibits in its appellate brief (W.D. Wis., No. 10-675, dkt. #3, pp. 9, 22-24, 40);

(2) appellee Phouthasone Sysouvanh's motion (dkt. #20) to strike all but the first two pages of FNBO's brief in opposition to Sysouvanh's letter attaching additional legal authority is **DENIED**; and

(3) the bankruptcy court's judgment in favor of appellee Phouthasone Sysouvanh is **AFFIRMED and REMANDED** for an award of fees and costs consistent with this court's opinion.

Entered this 28th day of August, 2013.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge

26